## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RENEE NEWTON, on behalf of herself and those similarly situated,<br><br>          Plaintiffs,<br><br>  v.<br><br>ESSILORLUXOTTICA S.A., LUXOTTICA GROUP, S.p.A., ESSILOR INTERNATIONAL SAS, GRANDVISION BV, ESSILORLUXOTTICA USA INC., LUXOTTICA U.S. HOLDINGS CORP., LUXOTTICA OF AMERICA, INC., ESSILOR OF AMERICA INC., FRAMES FOR AMERICA, INC., FOR EYES OPTICAL COMPANY, INC., COSTA DEL MAR, INC., OAKLEY, INC., EYEMED VISION CARE, LLC, and VISION SOURCE, LLC,<br><br>         Defendants. | Case No.  1:24-cv-5907<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff  Renee Newton ("Newton" or "Plaintiff"), on behalf of herself and all others similarly situated, brings this action against Defendants EssilorLuxottica S.A. ("EL"), Luxottica Group, S.p.A. ( "Luxottica Group"), Essilor International SAS ("Essilor International"), GrandVision BV ("GrandVision"), EssilorLuxottica USA Inc. ("EL USA"), Luxottica U.S. Holdings Corp. ('Luxottica Holdings"), Luxottica of America, Inc.("Luxottica America"), and Essilor of America Inc. ( "Essilor

1

America"), Frames for America, Inc. ("FOA"), For Eyes Optical Company, Inc. ("For Eyes"), Costa Del Mar, Inc. ("Costa"), Oakley, Inc. ("Oakley"), EyeMed Vision Care, LLC ("EyeMed"), Vision Source, LLC ("Vision Source" and collectively, the "Defendants") and alleges upon information and belief, except for her own actions,  as follows:

## I.    NATURE OF THE ACTION

1.    Acting in concert, Defendants and their co-conspirators conspired to raise, fix, and stabilize the prices charged for Eyewear (defined below in ¶ 69).

2.    Defendants did so by devising a scheme to create an illegal monopoly and to dominate the Consumer Eyewear Market (defined below in ¶ 69) in the United States (the "Scheme").

3.    Defendants have entered into unlawful agreements to fix the price of Eyewear at supra-competitive rates.

4.    Because of the Scheme and Defendants' unlawful agreements, Defendants have overcharged individuals in the United States and Defendants have obtained hundreds of millions of dollars in illegal profits due to supra-competitive prices.

5.    This is action brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, for injunctive relief and under certain state antitrust and consumer protection statutes based on Defendants' anticompetitive conduct to remedy the harm

this conduct has inflicted on hundreds of thousands, if not millions, of consumers.

6.    EL is the world's largest Eyewear conglomerate.

7.    EL describes itself as the "biggest in the industry" with a "[u]nique market structure" whose "scale disparity has increased further."[1]

8.    EL has monopoly power in the market for Eyewear and it controls corrective lens processing and corrective lens fabricating equipment.

9.    EL acquired its monopoly through a systematic program of acquiring its rivals and using its dominant market position to create barriers to foreclose competition in the Consumer Eyewear Market.

10.    As a direct and proximate result of Defendants' unlawful and anticompetitive Scheme and Defendants' anticompetitive practices, Plaintiff, and the members of the Classes (described below in Section VIII) have paid higher prices for Eyewear than they would have paid in a competitive marketplace absent the Scheme and the anticompetitive practices, and have thereby suffered, and continue to suffer, antitrust injury.

11.    Newton and millions of other consumers have suffered losses as a direct and proximate result of Defendants' unlawful conduct and are entitled to relief including but not limited to actual damages, treble damages, equitable relief, and

---

[1]    *See* EL Capital Market Day 2022, available at www.EL.com/en/cap/content/101694/ (last visited June 11, 2024).

reasonable costs and attorneys' fees.

## II.    PARTIES

12.    Newton, a resident of the states of New York and Florida, is an individual who purchased a pair of Ray-Ban and a pair of Costa sunglasses at an optician located in Palm Beach County, Florida on or about October 25, 2018.

13.    Newton brings this action on behalf of herself and all consumers in the United States who have purchased indirectly Eyewear from one of the Defendants.

14.    EL, is a joint stock company incorporated under the laws of France, with a registered office at 147 rue de Paris 94220, Charenton-le-Pont, France.

15.    EL was formed by a 2018 merger of Luxottica Group and Essilor International (the "2018 Merger").

16.    EL owns GrandVision.

17.    Luxottica Group is a corporation organized under the laws of Italy with its principal place of business at Piazzale Luigi Cadorna 3, 20121 Milan, Italy.

18.     Luxottica Group operates an office in the United States at 4000 Luxottica Place, Mason, Ohio 45040.

19.    Luxottica Group owns Luxottica U.S. and online retailer Glasses.com.

20.    Luxottica Group also owns Oakley, Alain Mikli, Arnette, Oliver Peoples, Persol, Ray-Ban, Seroflex, Starck Biotech Paris, and Vogue Eyewear (together with Costa, "Proprietary Brands"), and holds exclusive licenses for the

Eyewear brands of many horizontal competitors ("Fashion Houses").

21.    To the extent that several of the Fashion Houses have renewed their licensing agreements since the 2018 Merger of Luxottica Group and Essilor International, EL may hold these licensing agreements directly.

22.    Essilor International a French simplified joint-stock company with its principal place of business at 147 rue de Paris 94220, Charenton-le-Pont, France. Essilor International owns Costa.

23.    GrandVision is a Dutch corporation with its principal place of business at Tower C, 6th floor, Evert van de Beekstraat 1-80, 1118 CL Schiphol, Netherlands.

24.    GrandVision owns For Eyes.

25.    EL USA is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801.

26.    EL USA is a holding company for EL's North American business activities.

27.    Luxottica Holdings is a Delaware corporation with its principal place of business at 44 Harbor Park Drive, Port Washington, New York 11050.

28.    Luxottica Holdings owns Luxottica America.

29.    Luxottica America is an Ohio corporation with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040.

30.    Luxottica America owns Defendant EyeMed Vision Care, LLC.

31.    Luxottica America owns Eyewear retailers LensCrafters, Pearle Vision, Target Optical, Sunglass Hut (together with Oakley retail stores, Ray-Ban retail stores, Glasses.com, FramesDirect.com, and For Eyes, the "Retail outlets").

32.    Defendant Essilor America is a Delaware corporation with its principal place of business at 13555 N. Stemmons Fwy, Dallas, Texas 75234.

33.    Essilor America owns Vision Source and FOA.

34.    FOA is a Texas corporation with its principal place of business at 2801 S. Interstate 35, Suite 170 in Austin, Texas 78741.

35.    FOA, is an online Eyewear retailer that sells Eyewear under the service marks FramesDirect and FramesDirect.com.

36.    For Eyes is a Florida corporation with its principal place of business at 285 West 74th Place, Hialeah, Florida 33014.

37.    For Eyes is an online Eyewear retailer that sells Eyewear under the service mark For Eyes.

38.    Costa is a Florida corporation with its principal place of business at 2361 Mason Avenue, Suite 100, Daytona Beach, Florida 32117.

39.    Oakley is a Washington corporation with its principal place of business at One Icon, Foothill Ranch, California 92610.

40.    EyeMed is a company formed under the laws of Delaware with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040.

6

41.    Vision Source is a company formed under the laws of Texas with its principal place of business at 23824 Highway 59 N, Kingwood, Texas 77339.

42.    The Defendants' anticompetitive and unfair business practices in the Consumer Eyewear Market (described below in Section VIII) caused Newton and the Classes to pay supra-competitive prices for Eyewear.

43.    Defendants entered into unlawful agreements to fix the price of Eyewear at supra-competitive prices in violation of § 1 of the Sherman Antitrust Act and the consumer protection and antitrust statutes of numerous states.

44.    EL controls 80 percent of the global Eyewear Market.

45.    EL is a global manufacturing network, which brings Eyewear to a network of 300,000 third-party stores from independent opticians to distribution chains.

46.    EL also has 200 e-commerce platforms and an extensive retail network of 18,000 stores.

47.    Through acquisitions, licensing agreements, and sales agreements, EL has positioned itself as a vertically integrated, multinational giant, which designs, manufactures, distributes, and/or sells over thirty consumer Eyewear brands in the United States.

48.    Additionally, EyeMed, owned chain retail outlets, and affiliated eye care providers.

7

49.    EL is among the largest entities in both the vision benefits and eye care industries, exercising control over more than 80 percent of American optometrists.

50.    EL has formed exclusive licensing agreements and sales agreements with its horizontal competitors in the Consumer Eyewear Market to manipulate and artificially inflate the price of Eyewear by as much as 1000 percent for Defendants' collective financial benefit.

51.    EL, through its vision benefits subsidiary EyeMed, has also formed anticompetitive agreements with thousands of American eye care providers to unfairly direct millions of consumers into purchasing its over-priced Eyewear.

### III.    JURISDICTION

52.    This Court has subject matter jurisdiction over Newton's claims under 15 U.S.C. § 15; 28 U.S.C. § 1331; and 28 U.S.C. § 1337(a).

53.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332, as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than each Defendant; there are more than 100 members of the Class; and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

54.    This Court has supplemental jurisdiction of the state law claims under 28 U.S.C. § 1367(a).

55.    This Court has personal jurisdiction over Defendants pursuant to Fed.

R. Civ. P. 4(k) and 15 U.S.C. § 22, which permits a lawsuit to be filed against a corporation in any district where the corporation may be found or transacts business and permits all process in such cases to be served in any district where the corporation may be found.

56.    This Court has personal jurisdiction over EL, Essilor International, Luxottica Group and GrandVision (the "Foreign Defendants") pursuant to Fed. R. Civ. P. 4(k)(2) because (a) these Foreign Defendants are foreign companies, incorporated and headquartered in foreign countries, and therefore not subject to jurisdiction in any state court of general jurisdiction; and (b) jurisdiction is consistent with the United States Constitution and laws because these Foreign Defendants purposefully directed their activities at the United States. Newton's claims arise out of these contacts with the United States, and the exercise of jurisdiction is reasonable.

57.    Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

58.    The activities of Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

59.    Defendants' products and services are sold in the flow of interstate commerce.

## IV.    VENUE

60.    Venue is proper in this District pursuant to §§ 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22); and 28 U.S.C. § 1391(b) and because Defendants transacted business throughout the United States, including in this District; sold the products or services at issue throughout the United States, including in this District; had substantial contacts with the United States, including this District; and engaged in anticompetitive conduct that was directed at and had a foreseeable, direct, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

## VI.    AGENTS AND CO-CONSPIRATORS

61.    The anticompetitive and unlawful acts alleged against Defendants were authorized, ordered, and/or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of Defendants' business or affairs.

62.    The officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals. Alternatively, the agents acted within the scope of their explicit and apparent authority, binding their respective principles.

63.    Each Defendant, and its respective subsidiaries, affiliates and agents operated as a single unified entity.

10

64.    Defendants conspired with Fashion Houses, other Competing Eyewear Entities, as defined below in ¶ 97b., and Third-Party Sellers (as defined below in ¶ 88) to fix prices through long-term exclusive licensing agreements and distribution agreements.

65.    Through these agreements, Defendants were able to fix the price of Eyewear at supra-competitive levels and set the price floor for Eyewear, effectively eliminating competition.

66.    Various persons, businesses, and/or entities that are not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof.

67.    These other persons, businesses and/or entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in connection with EL's monopolization of Eyewear.

68.    Plaintiff reserves the right to name some or all these entities as Defendants.

## VII.   THE RELEVANT MARKET

69.    The relevant product market is the market for non-contact-lens consumer Eyewear. This market consists of two sub-markets – (a) prescription eyeglasses (including prescription sunglasses) and (b) non-prescription sunglasses ("Consumer Eyewear Market").

11

70.    The geographic scope of this market is the United States.

71.    In 2022, the Consumer Eyewear Market was estimated to generate over $24 billion in revenue. Of this, the sunglasses sub-market accounted for over $4 billion.

72.    The relevant market has several characteristics that distinguish it from the contact lens market.

73.    The consumer Eyewear manufacturers and retailers look primarily to other consumer Eyewear products to set pricing, not to the pricing of contact lenses.

74.    Also, consumer Eyewear sales are distinct from and independent of contact lens sales: a consumer Eyewear purchase involves a one-time transaction for an Eyewear product that lasts indefinitely, while contact lenses require frequent replacement and are sold in package quantities ranging from 2 to 180 lenses.

75.    Further, the products serve distinct purposes. Nonprescription sunglasses chiefly protect from sunlight and ultraviolet radiation, while contact lenses correct vision.

76.    Contact lenses are not a substitute for prescription eyeglasses.

77.    The Fashion Houses are participants in the consumer Eyewear market but not the contact lens market.

78.    Tints and frame style are the primary role in a consumer's selection of prescription eyeglasses.

79.    The relevant market includes all reasonably interchangeable products, and EL and the other Defendants—who together control upwards of 80 percent of the Consumer Eyewear Market, including a supermajority of the most popular Eyewear brands in the United States—were capable of and did impose significant price increases in the Consumer Eyewear Market without losing a considerable number of customers to contact lenses or any other supposed alternative product.

## VIII.  FACTUAL ALLEGATIONS

80.    Essilor International is the largest maker of eyeglass lenses worldwide, and it owns consumer Eyewear brands and retail outlets.

81.    In January 2017, Luxottica Group announced a proposed merger with Essilor International.

82.    In 2018, the 2018 Merger was consummated.

83.    EL has developed a geographic footprint that spans the United States.

84.    EL's retail outlets operate online and in over 3,800 brick-and-mortar stores in the United States.

85.    EL acquired LensCrafters in 1995; Sunglass Hut in 2001; Pearle Vision and Target Optical in 2004; FramesDirect.com in 2009; Glasses.com in 2014, and For Eyes in 2021.

86.    EL sells Eyewear directly to consumers through its retail outlets.

87.    EL also sells Eyewear through ophthalmic distributors and third-party

retail channels ("Third-Party Sellers").

88.    EL owns several Proprietary Brands, including Costa (acquired 2014), Oakley (acquired 2007), Ray-Ban (acquired 1999), Alain Mikli (acquired 2013), Arnette (acquired 1999), Oliver Peoples (acquired 2007), Persol (acquired 1995), Sferoflex (acquired 1981), Starck Biotech Paris (acquired 2013), and Vogue Eyewear (acquired 1990).

89.    In addition to EL's owned Proprietary Brands, EL has exclusive licensing deals with the Fashion Houses for their Eyewear brands, which include: Armani Exchange, Brooks Brothers, Brunello Cucinelli, Bulgari, Burberry, Chanel, Chaps, Coach, DbyD, Dolce & Gabbana, Emporio Armani, Ferrari, Giorgio Armani, Michael Kors, Miu Miu, Native, Polo Ralph Lauren, Prada, Ralph Lauren, Swarovksi, Tiffany & Co., Tory Burch, and Versace ("Licensed Brands").

90.    EL sells both its Proprietary Brands and Licensed Brands in its retail outlets and through Third-Party Sellers.

91.    EL has conducted business across the United States for decades.

92.    EL controls a significant portion of the Consumer Eyewear Market.

93.    Even before the 2018 Merger, as much as 80 percent of the global Consumer Eyewear Market was controlled by Luxottica Group.

94.    EL's net sales in North America were estimated in 2022 to amount to over $12.5 billion, the majority of which derived from EL's business activities in the

United States.

## IX.   EL'S UNLAWFUL PRICE-FIXING PRACTICES

95.    EL has formed unlawful agreements with its horizontal competitors to fix Eyewear prices in the Consumer Eyewear Market at supra-competitive rates.

a. EL produces and distributes Eyewear for brands owned by the Fashion Houses such as Armani, Prada, Chanel, and Ralph Lauren under exclusive licensing agreements that in effect give EL price-setting authority for the Eyewear of each of these popular brands.

b. EL uses sales agreements with horizontal competitors with whom EL does not have an exclusive license ("Competing Eyewear Entities") to market and sell brands like Gucci, Tom Ford, and Fendi in retail outlets that EL owns and at prices over which EL exercises control.

c. EL markets and sells its owned brands, including but not limited to Ray-Ban, Oakley, and Costa, over which EL exercises price-setting authority.

96.    EL, the Fashion Houses, and the Competing Eyewear Entities are each horizontal competitors in the Consumer Eyewear Market. However, they engage together in anticompetitive and unfair business practices through their unlawful licensing and sales agreements to exercise strategic control over the price and supply

of Eyewear in the United States Consumer Eyewear Market.

97.    Each of the unlawful agreements was entered into in furtherance of EL, the Fashion Houses, and Competing Eyewear Entities' efforts to manipulate the Consumer Eyewear Market for their mutual benefit by charging supra-competitive prices for Eyewear to consumers like Newton.

98.    Each of the unlawful agreements has an anticompetitive effect on the Consumer Eyewear Market.

99.    EL and its horizontal competitors—together constituting more than two dozen of America's most popular Eyewear brands—have used their unlawful agreements to artificially inflate the price of consumer Eyewear by as much as 1000 percent.

### 1.    *Unlawful Licensing Agreements with the Fashion Houses*

100.    The Fashion Houses produce clothing and accessories, including Eyewear.

101.    The Fashion Houses own and exploit their well-known brands, including but not limited to Chanel, Coach, Polo Ralph Lauren, Prada, and Versace.

102.    The Fashion Houses are horizontal competitors of one another in the market for Eyewear and are actual or potential horizontal competitors of EL in the same market.

103.    At all material times, the Fashion Houses operated or had access to

independent production facilities for the manufacture of Eyewear.

104.    Each of the Fashion Houses either produced or had the ability to produce its own Eyewear at all material times.

105.    Over the course of decades, EL has entered into a series of licensing agreements with each of the named Fashion Houses for their Eyewear brands.

106.    The initial dates of these licensing agreements include:

    a.  1988: Giorgio Armani;

    b.  1992: Brooks Brothers;

    c.  1997: Bulgari;

    d.  1999: Chanel;

    e.  2003: Prada;

    f.  2003: Versace Group;

    g.  2006: Dolce & Gabbana;

    h.  2006: Burberry;

    i.  2007: Ralph Lauren;

    j.  2008: Tiffany;

    k.  2012: Coach;

    l.  2015: Michael Kors; and

    m. 2022: Swarovski.

107.    EL has maintained these licensing agreements and has signed multi-year

renewal agreements with the Fashion Houses to uphold its market dominance.

108.    These renewal agreements include:

    a.  2014: A ten-year renewal with Tory Burch;

    b.  2015: A ten-year renewal with Burberry;

    c.  2015: A ten-year renewal with Dolce & Gabbana;

    d.  2015: A ten-year renewal with Michael Kors;

    e.  2015: A ten-year renewal with Prada;

    f.  2016: A ten-year renewal with Ralph Lauren;

    g.  2017: A ten-year renewal with Tiffany & Co;

    h.  2020: A five-year renewal with Chanel;

    i.  2020: A ten-year renewal with Versace Group;

    j.  2021: A three-year renewal with Bulgari;

    k.  2021: A five-year renewal with Coach; and

    l.  2023: A fifteen-year renewal with Armani Group.

109.    The licensing agreements between EL and Fashion Houses have certain basic terms.

    a)  The licensing agreements are *inter alia* exclusive multiyear licenses for the design, manufacture, and distribution of Eyewear—including distribution directed to the United States—under the brands of the Fashion Houses ("Licensing Agreements").

18

b)   In exchange for the grants of the licenses, EL pays Fashion Houses royalties on the sales of their Eyewear.

110.   Under the Licensing Agreements, EL is designated the agent of the Fashion Houses vis-à-vis their Eyewear brands.

111.   Pricing decisions are delegated to EL.

112.   In the alternative, the Licensing Agreements include most-favored nation and other price-coordination clauses, which result in the alignment and inflation of prices to supra-competitive levels for the benefit of EL and the Fashion Houses collectively.

## 2. *Sales Agreements with Competing Eyewear Entities*

113.   In addition to the Licensing Agreements with the Fashion Houses, EL maintains sales agreements with Eyewear manufacturers, owners, or license-holders who are actual or potential horizontal competitors to EL, by which EL agrees to sell the Competing Eyewear Entities' Eyewear brands in its various Retail outlets.

114.   For example, EL sells sunglasses in its Sunglass Hut locations owned, licensed, or manufactured by Kering Eyewear S.p.A.  ("Kering Eyewear"), Marcolin S.p.A. ("Marcolin"), Christian Dior SE ("Christian Dior'), LVMH, and Thélios S.p.A. ("Thélios").

115.   Brands owned, licensed, or manufactured by Kering Eyewear for sale at Sunglass Hut include Balenciaga, Chloe, Gucci, Maui Jim, and Saint Laurent. Gucci

and Maui Jim are both among the ten most popular brands in the United States. States.

116.   Brands owned, licensed, or manufactured by Marcolin for sale at Sunglass Hut include Tom Ford.

117.   Brands owned, licensed, or manufactured by Christian Dior for sale at Sunglass Hut include Christian Dior.

118.   Brands owned, licensed, or manufactured by LVMH and Thélios for sale at Sunglass Hut include Celine and Fendi. Thélios exists solely to design, produce, and distribute LVMH's branded Eyewear.

119.   The sales agreements between EL and the Competing Eyewear Entities have certain basic terms.

      a)   The sales agreements are multi-year licenses for the distribution and sale of Eyewear ("Sales Agreements").

      b)   Under the Sales Agreements, EL pays the Competing Eyewear Entities (or their relevant Fashion Houses) royalties or a portion of the gross total of sales on Eyewear sold through EL's Retail outlets.

120.   Under the Sales Agreements, EL is designated the agent of the Competing Eyewear Entities or their corresponding Fashion Houses vis-à-vis their Eyewear brands.

121.   Pricing decisions for sales through the retail outlets are delegated to EL.

122.   In the alternative, the Sales Agreements include most-favored nation and

other price-coordination clauses, which result in the alignment and inflation of prices to supra-competitive levels for the benefit of EL and the Competing Eyewear Entities collectively.

### 3. *Anticompetitive and Unfair Price-Fixing*

123.   The existence of the Licensing Agreements between EL and each of the Fashion Houses, and the existence of the Sales Agreements between EL and each of the Competing Eyewear Entities, is and has always been known to each of the Fashion Houses and Competing Eyewear Entities.

124.   The fact that EL is a party to and privy to all the Licensing Agreements and Sales Agreements is and has always been known to each of the Fashion Houses and the Competing Eyewear Entities.

125.   The Fashion Houses and Competing Eyewear Entities entered into the Licensing Agreements and Sales Agreements with EL (and through it, their competitors) with the intention of benefitting from the coordination of distribution and pricing, access to pricing information, and the ability to charge supra-competitive prices for their Eyewear, including through the payment of royalties by EL.

126.   EL entered into the Licensing Agreements and Sales Agreements with the competitor Fashion Houses and Competing Eyewear Entities with the intention of benefitting from the coordination of distribution and pricing, access to pricing information, the ability to charge supra-competitive prices for its Eyewear, and to

exercise control over the production and supply of Eyewear.

127.  EL does not identify for consumers in its retail outlets that it is the exclusive licensee, manufacturer, and/or distributor of most of the Eyewear it sells.

128.  EL does not disclose to consumers that it has contractual agreements with its competitors that ensure the Proprietary Brands, Licensed Brands, and the brands of the Competing Eyewear Entities are each artificially inflated to supra-competitive prices.

129.  Through these anticompetitive and unfair Licensing Agreements and Sales Agreements, EL ensures that Eyewear for its Proprietary Brands, Licensed Brands, and the brands of the Competing Eyewear Entities—all of which are actual or potential horizontal competitors—are priced at supra-competitive rates within the Retail outlets to the injury of consumers like Newton and for the collective benefit of Defendants.

130.  In addition to price-fixing within its own retail outlets, EL imposes discount restrictions on Third-Party Sellers.

131.  These restrictions secure a price-fixing scheme across the consumer Eyewear Market.

132.  The restrictions prevent Third-Party Sellers from marketing EL Proprietary Brands or Licensed Brands at a discounted rate.

133.  The discount restrictions ensure that no matter the retailer, whether

beholden to EL directly or by contract, artificially high price inflation remains.

134.   EL's unlawful Licensing Agreements, Sales Agreements, and discount restrictions with the Fashion Houses, Competing Eyewear Entities, and Third-Party Sellers have injured Newton and Class Members and continue to injure consumers nationwide.

135.   The Eyewear over which EL exercises price-fixing ability is not worth the price consumers pay.

136.   The estimated mark-up on consumer Eyewear runs as much as 1000 percent.

137.   E. Dean Butler, the founder of LensCrafters ("Butler"), has explained that consumers could purchase designer-level frames for $15 and "first-quality lenses for $1.25 apiece," and laughingly acknowledged that the retail price of Eyewear in America is artificially inflated: "It's ridiculous. It's a complete rip-off."

138.   Indeed, many non-prescription Ray-Ban sunglasses retail for over $450, with some frames priced at over $1,000.

139.   Other EL non-prescription sunglass brands like Oliver Peoples sell for nearly $400 at Sunglass Hut for the cheapest frames and run as high as $1,750.

140.   EL's anticompetitive and unfair acts and omissions lead American Eyewear consumers to believe that they have a choice of fairly priced Eyewear among over two dozen of the most well-known (and ostensibly competitive) brands.

23

141.   EL and the other Defendants engaged and continue to engage in price-fixing schemes for their collective financial gain, deceiving consumers into purchasing Eyewear products at supra-competitive prices from EL's retail outlets and Third-Party Sellers.

142.   As Butler said of EL: "If that's not a monopoly, I don't know what is."

## X.    EL'S UNLAWFUL CONSUMER CHANNELING PRACTICES

143.   EL further perpetuates its price-fixing scheme through the deceptive channeling of millions of eye care patients to the purchase of its Eyewear.

144.   EL accomplishes this through EyeMed, its wholly owned subsidiary and one of the largest vision benefits companies in the United States.

145.   EyeMed insures nearly 72 million members and proclaims itself "America's fastest growing vision benefits company," and its provider list as "America's largest vision network."

146.   According to at least one article, EL exercises "control over 83 percent of optometrists" through EyeMed.

147.   EyeMed's practices are both anticompetitive and unfair to consumers.

148.   EyeMed mandates and financially incentivizes its thousands of in-network providers to market and/or sell a certain inventory of over-priced EL Eyewear to consumers.

149.   EyeMed conceals these requirements and incentives from Newton and

Class members.

150.   Further, EyeMed itself markets EL Eyewear directly to its millions of members, unreasonably failing to disclose its corporate ties to the Eyewear brands.

151.   These consumer channeling practices are contrary to the American Optometric Association's Standards of Professional Conduct:

> The care of a patient should never be influenced by the self-interests of the provider. Optometrists should avoid and/or remove themselves from any situation that presents the potential for a conflict of interest where the optometrist's self-interests are in conflict with the best interests of the patient. Disclosure of all existing or potential conflicts of interest is the responsibility of the optometrist and should be appropriately communicated to the patient.

I'm not getting why this is in here. Are we saying that optometrists are in on it? Then why aren't they defendants?

152.   EyeMed deceives its members as to their eye care professionals' independence and loyalty, creating conflicts of interest for channeling consumers to EL's Eyewear by the means described below.

### 1. *Vision Source and the Independent Providers Deceptively Perpetuate the Price-Fixing Scheme*

153.   EyeMed markets to members a network of "independent" eye care providers ("Independent Providers").

154.   Each of the Independent Providers offers optometrists and/or opticians' services to fit and assist consumers in purchasing appropriate prescription Eyewear.

155.   Concealed from consumers, however, is the fact that each of these

Independent Providers has anticompetitive arrangements with EL and/or EyeMed.

156.   A significant number of these "Independent Providers" are not independent of the EL corporate structure.

157.    Vision Source—which touts itself as "a family of 3,100 locally owned optometric practices," and claims that its mission is to enable "independent optometrists to reach their full potential"—is a wholly owned subsidiary of Essilor America and functions to deceptively perpetuate EL's price-fixing scheme.

158.   Vision Source's network includes 4,500 optometrists, treats "an estimated 16 million patients every year," and is the largest optical retailer in the United States.

159.   In 2022, Vision Source's revenue in the Consumer Eyewear Market exceeded $2.6 billion.

160.   Each of Vision Source's 3,100 optometric practices are franchisees are bound by several anticompetitive and unfair requirements to maintain or market a certain inventory of EL Eyewear products, and/or to ensure that a certain portion or gross total of the franchisees' Eyewear sales to EyeMed members are derived from EL products.

161.   Vision Source does not disclose to consumers that it is a wholly owned subsidiary of EL, or that each of its franchisees is bound by anticompetitive obligations to peddle supra-competitively priced EL products.

26

162.    Rather, Vision Source deceives consumers into believing that it is merely a network of private family optometry practices.

163.    Many Vision Source franchisees do not identify on their websites or in their business names that they are tied to Vision Source and EL.

164.    Vision Source goes so far as to market to consumers that the company will connect them with "Private Practice Optometrists" to serve as their "family eye doctor," form with them a "special relationship," and ensure that decisions regarding patients' "eye health . . . are based upon what is best for your eyes."

165.    Vision Source does not act in the best interests of its patients' eyes, but in the best interests of EL.

166.    Under contracts between EyeMed and the Independent Providers, EyeMed markets the Independent Providers' services to its members and in exchange, the Independent Providers accept certain reimbursement rates from EyeMed and agree to be bound by several anticompetitive and unfair terms that favor EL, including the following:

    a.  EyeMed requires as a baseline condition that its providers "have to be in good standing with EL and all relevant subsidiaries." That is, EyeMed directly mandates as a condition of joining the largest vision benefits network in America that Independent Providers treat with special favor a host of EL entities. EyeMed conceals this information from it members. ??benefits

    b.  EyeMed additionally mandates that unless a specific contract allows otherwise, all providers "… must use our network labs . . . for all

27

EyeMed member Eyewear."

   c.  EyeMed states that this lab network includes "Essilor Labs, Walman labs and Luxottica Lab Services (LLS)."

   d.  These contracted labs are controlled by EL.

   e.  EyeMed likewise conceals from its members that the in-network providers they visit, even Independent Providers, are required to use EL-controlled labs to produce its members' Eyewear. ??members?

   f.  EyeMed also requires that "[w]hen using the lab network for Eyewear orders, you're [the providers] required to order lenses listed in the Essilor or Luxottica Lab Services product catalogs."

   g.  In other words, EyeMed requires that its providers fulfill consumers' orders both through EL labs and with EL products.

### 2. *EL's Retail Outlets Deceptively Perpetuate the Price-Fixing Scheme*

167.   Among brick-and-mortar Retail outlets, EyeMed's webpages advertise only those outlets owned by EL, which primarily or solely market EL Eyewear products: LensCrafters, Pearle Vision, and Target Optical.

168.   EyeMed does not disclose on its website that each of these outlets is part of the same Eyewear conglomerate to which EyeMed itself belongs.

169.   EyeMed also markets online Retail outlet sales, claiming that the company "believe[s] in benefits without boundaries"—though all the while bordering its unwitting members within walls of the EL conglomerate. EyeMed markets only the sales webpages of EL-owned retail outlets like LensCrafters, Target Optical, Ray-Ban, and Glasses.com, concealing from consumers that the vision benefits provider

operates to perpetuate EL's price-fixing scheme.

### 3.  *EyeMed Deceptively Directs Consumers to Providers with the Most Favorable Arrangements with EL*

170.   EyeMed employs a tiered provider marketing system, advertising a category of "PLUS Providers" to its members and promising that at these locations members will "maximize your benefits, with extra coverage to help you save even more."

171.   PLUS Providers are in-network providers who (a) are owned by EL, (b) are Vision Source franchisees, or (c) have entered into additional agreements with EyeMed and/or EL to maintain or market a certain inventory of EL Eyewear products, and/or to ensure that a certain portion or gross total of the in-network providers' Eyewear sales to EyeMed members are traceable to EL products.

172.   EyeMed does not disclose to members that the "PLUS Provider" distinction is associated with certain requirements to stock, market, and/or sell EL Eyewear.

173.   EL uses EyeMed as a channel by which it furthers its anticompetitive price-fixing scheme. EyeMed both directly steers unsuspecting members to EL's Eyewear and imposes anticompetitive conditions on its in-network providers—which include over 80 percent of American optometrists—to incentivize and mandate preferential treatment toward the conglomerate, through which EL unfairly peddles

29

its over-priced Eyewear to millions of consumers.

174.   Even LensCrafter's founder E. Dean Butler has referred to the pressures EL exerts on eye care professionals as "an incredible conflict of interest," stating that "[t]he vision plans are manipulating the market for their own benefit," and that "[o]ptometrists have lost control of their own profession."

175.   Independent Providers cave to EL's anticompetitive and unfair business practices because of EyeMed's dominance in the American vision benefits market.

176.   Any provider who runs afoul of EyeMed or the greater EL machine risks losing access to EyeMed's nearly 72 million members.

177.   EL's unlawful practices through EyeMed are especially egregious considering the duty of loyalty consumers reasonably expect from the eye care professionals they visit.

178.   Not only are members unaware of EyeMed's relationship with EL and its prescription retail outlets, or of the demands EyeMed imposes on Independent Providers, but members are affirmatively harmed by the conflicts of interest created by the hidden, predatory, and anticompetitive relationships between EyeMed and its in-network providers—entities purportedly dedicated to quality eye care—for the financial benefit of EL.

179.   Through the above-described anticompetitive and unfair business practices, consumers, like Plaintiff and the Classes purchased Eyewear products with

artificially inflated price tags from retail outlets and Independent Providers who, unbeknown to consumers, have incentives and mandates to push EL's Eyewear— whether directly as subsidiaries of EL or indirectly through contracts with EyeMed and/or EL.

## XI.  ANTICOMPETITIVE EFFECTS OF THE UNLAWFUL PRACTICES

180.  EL's authority to set Eyewear prices on behalf of itself, the Fashion Houses, and the Competing Eyewear Entities under the unlawful Licensing Agreements and Sales Agreements permits EL to charge supra-competitive consumers.

181.  EL also benefits from anticompetitive arrangements it imposes on Third-Party Sellers to prohibit unauthorized Eyewear discounts, increasing EL's profit margins and market power at consumers' expense.

182.  EL additionally benefits from anticompetitive agreements formed through its subsidiary EyeMed with thousands of eye care providers, which perpetuate EL's price-fixing scheme.

183.  EyeMed requires that its in-network providers maintain good standing with EL and its subsidiaries, forces providers to use EL products and services to fulfill Eyewear orders, and mandates that providers market and/or sell a certain array of supra-competitively priced EL Eyewear products to consumers, thereby increasing EL's profit margins and market power at consumers' expense.

31

## XII.  CONCEALMENT OF UNLAWFUL AGREEMENTS

184.  Defendants committed to keep the terms of their unlawful agreements concealed from Newton and Class Members.

185.  Each Licensing Agreement, Sales Agreement, and all agreements between EL or EyeMed and its in-network providers contained a provision preventing the parties from disclosing the agreements' terms to the public.

## XIII.  CLASS ALLEGATIONS

186.  Plaintiff brings this action individually and on behalf of all others similarly situated under Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(2), as representative of a Class of indirect purchasers seeking injunctive relief ("Injunctive Relief Class") defined as follows:

> Any person in the United States who indirectly purchased Eyewear of any of the Proprietary Brands, Fashion House Licensed Brands, and the brands of Competing Eyewear Entities.

187.  Plaintiff also brings this action individually and on behalf of all others similarly situated under Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representative of a Class seeking damages for violations of various state antitrust and consumer protection laws from January 1, 2018, until the anticompetitive practices alleged in this Complaint cease (the "Class Period"), defined as:

> Any person who indirectly purchased Proprietary Brands, Fashion House Licensed Brands, and the brands of Competing Eyewear Entities in, Alaska, Arizona, Arkansas,  California,  Colorado,

Connecticut, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

(the "State Law Class").

188.   While the exact number of members of the Injunctive Relief Class and State Law Class ("Classes" or "Class Members") is unknown, Newton submits that there are millions of individuals throughout the United States who are potential members of the Classes which are so numerous, individual joinder of these members is impracticable.

189.   Newton further alleges the Class Members will be ascertainable through Defendants' records,

190.    The Classes are so numerous that joinder of all members would be impracticable.

191.   Plaintiff's claims are typical of those of the Classes.

192.   Plaintiff will fairly and adequately protect and represent the interests of the Classes.

193.   The interests of the Plaintiff are in accordance with those of the Classes.

194.   Questions of law and fact common to the members of the Classes will prevail over questions, should they arise, that may be individual to individual Class

Members because Defendants have acted on grounds generally applicable to the Classes.

195.    There are common questions of law and/or fact shared by Newton and each Class Member. The common questions of law and/or fact include, but are not limited to, the following:

a.  whether Defendants entered agreements which restrained competition;

b.  whether such agreements are unlawful;

c.  whether Defendants' conduct injured consumers; and

d.  the appropriate nature of class-wide injunctive or other equitable relief.

196.    Certification of the Classes under Fed. R. Civ. P. 23(a) and 23(b)(3) is appropriate as to the members of the Classes in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy.

197.    All Class Members were subject to the same conduct by Defendants.

198.    A class action will cause an orderly and expeditious administration of claims by the members of the Classes, and economies of time, effort, and expenses will result, and uniformity of decisions will be ensured.

199.    Newton's claims are typical of the claims of the Classes pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) since they are based on and arise out of identical facts

constituting the wrongful conduct of Defendants.

200.    Newton is an adequate representative of the Classes because her interests do not conflict with the interests of other Class Members, and she will fairly and adequately protect their interests.

201.    Newton is cognizant of her responsibility as a class representative and has retained experienced counsel fully capable of, and intent upon, vigorously pursuing the action.

202.    Class counsel has extensive experience in class action litigation.

203.    The Classes have suffered actual damages, losses, and harms as those sustained by Newton, including statutory damages.

## XIV.  CLAIMS

### COUNT I

### VIOLATIONS OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1, ET SEQ.

204.    Newton re-alleges and incorporates by reference each allegation set forth in paragraphs 1through 203 as if fully set forth herein.

205.    This claim is brought by Newton individually and on behalf of the Injunctive Relief Class against all Defendants.

206.    Defendants entered and engaged in unlawful agreements that unreasonably restrained trade in violation of §§ 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 3.

207. The restraint of trade consisted of a continuing agreement, understanding, or concerted action between and among Defendants by which Defendants fixed the price of Eyewear in the Consumer Eyewear Market at supra-competitive rates and channeled consumers to these Eyewear products.

208. Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between, and among Defendants and other unnamed entities. Defendants' actions constitute per se violations of the Sherman Antitrust Act, and are, in any event, unreasonable and unlawful restraint of trade.

209. There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade.

210. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

211. Defendants' agreements and the resulting impact on the price of consumer Eyewear occurred in and affected interstate commerce and commerce in and between the Territories of the United States.

212. As a direct, intended, foreseeable, and proximate result of Defendants' agreements and overt acts taken in furtherance thereof, Defendants' unlawful conduct injured Newton and Class Members, who seek damages in an amount to be proven at trial under § 4 of the Clayton Act, which is codified at 15 U.S.C. § 15.

213. Newton and each Class Member's damages are directly attributable to

Defendants' conduct, which resulted in all Class Members paying artificially inflated prices for Eyewear during the class period that they would not have otherwise paid but for Defendants' agreements.

214.    Newton and Class Members' injuries are of the type of the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

215.    Each Defendant is jointly and severally liable for the harm caused by its conduct or by EL from the time each Defendant entered into an anticompetitive agreement to the present.

## COUNT II:

### INJUNCTIVE RELIEF
### FOR VIOLATIONS OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 2
### (ON BEHALF OF THE INJUNCTIVE RELIEF CLASS)

216.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 203.

217.    This Count is brought on behalf of the Injunctive Relief Class.

218.    Plaintiff and members of the Injunctive Relief Class plead equitable relief in the alternative to any legal claims and further plead they have no adequate remedy at law.

219.    Because of the foregoing Plaintiff and the Injunctive Relief Class is entitled to injunctive relief.

<u>**COUNT III:**</u>

<u>**VIOLATION OF STATE ANTITRUST LAWS**</u>
<u>**(ON BEHALF OF STATE LAW CLASS)**</u>

220.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 203.

221.   By engaging in the foregoing conduct, Defendants wrongfully engaged in conduct, a combination, and/or conspiracy in restraint of trade in violation of the following state antitrust laws, with respect to purchases in the below respective States and/or purchases made by residents of the below States:

  a.     Ariz. Rev. Stat. §§ 44-1402, et seq.;

  b.     Ark. Code Ann. §§ 4-75-309, et seq.;

  c.     Cal. Bus. and Prof. Code §§ 16720, et seq.;

  d.     Colorado Antitrust Act of 2023, C.R.S § 6-4-101

  e.     Conn. Gen. Stat. Ann. §§ 35-26, et seq.;

  f.     D.C. Code §§ 28-4502, et seq.;

  g.     Haw. Rev. Stat §§ 480-1, et seq.;

  h.     740 Ill. Comp. Stat. 10/3, et seq.;

  i.     Iowa Code §§ 553.4, et seq.;

  j.     Kan. Stat. Ann. §§ 50-101, et seq. and 50-158, et seq.;

  k.     Me. Stat. tit. 10 §§ 1101, et seq.;

l.      Md. Code, Com Law, §§ 11-204, et seq.;

m.      Massachusetts Antitrust Act §§ 1-14A;

n.      Mich. Comp. Laws §§ 445.772, et seq.;

o.      Minn. Stat. §§ 325D.49, et seq.;

p.      Miss. Code Ann. §§ 75-21-3, et seq.;

q.      Neb. Rev. Stat. §§ 59-801, et seq.;

r.      Nev. Rev. Stat. §§ 598A.060, et seq.;

s.      N.H. Rev. Stat. Ann. §§ 356:2, et seq.;

t.      N.M. Stat. Ann. §§ 57-1-1, et seq.;

u.      N.Y. Gen. Bus. Law §§ 340, et seq.;

v.      N.C. Gen. Stat. §§ 75-1, et seq.;

w.      N.D. Cent. Code §§ 51-08.1-02, et seq.;

x.      Or. Rev. Stat. §§ 646.725, et seq.;

y.      R.I. Gen. Laws §§ 6-36-4, et seq.;

z.      S.D. Codified Laws §§ 37-1-3.1, et seq.;

aa.      Tenn. Code Ann. §§ 47-25-101, et seq.;

bb.      Utah Code Ann. §§ 76-10-3104, et seq.;

cc.      Vt. Stat. Ann. Tit. 9 §§ 2453, et seq.;

dd.      W. Va. Code §§ 47-18-1, et seq.; and

ee.    Wis. Stat. §§ 133.03, et seq.

222.    Plaintiff and members of the State Law Class have been injured by Defendants' antitrust violations alleged herein, including paying supra-competitive prices for their branded Eyewear.

223.    But for such conduct, Plaintiffs would have purchased their Eyewear for less in a properly functioning, competitive market. These injuries are of the type that the foregoing laws are intended to prevent, and flow from that which makes Defendants' conduct unlawful.

224.    Plaintiff and the State Law Class seek all damages permitted by law for their injuries by Defendants' violations of the statutes.

## COUNT IV

### VIOLATION OF STATE CONSUMER PROTECTION LAW
### (ON BEHALF OF STATE LAW CLASS)

225.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 203.

226.    By engaging in the unfair and unlawful conduct alleged in this Complaint and with respect to purchases in the below respective States and/or purchases made by residents of the below States, Defendants violated the following state consumer protection laws:

a.    Alaska Stat. § 45.50.531;

b.    Ariz. Rev. Stat. Ann. §§ 44-1521, *et seq*.;

c.    Arkansas Code Annotated, § 4-88-101, *et seq*.;

d.    Cal. Bus. & Prof. Code §§ 17200, *et seq*.;

e.    Colo. Rev. Stat. §§ 6-1-101, *et seq*.;

f.    District of Columbia Code § 28-3901, *et seq.*

g.    Fla. Stat. §§ 501.201, *et seq*.;

h.    Hawaii Revised Statutes Annotated §§ 480-1, *et seq.;*

i.    815 Ill. Comp. Stat. 505/1, *et seq*.;

j.    Mass. G.L. c. 93A, §2;

k.    Mich. Comp. Laws. §§ 445.901, *et seq.;*

l.    Minn. Stat. § 325D.43, *et seq.;*

m.    Mo. Rev. Stat. § 407.010, *et. seq.;*

n.    Mont. Code, §§ 30-14-101, *et seq.;*

o.    Neb. Rev. Stat. § 59-1601, *et seq;*

p.    Nev. Rev Stat. Ann. §§ 598.0903, *et seq*.;

q.    N.J. Stat. § 56-8-1, *et seq.*;

r.    N.M. Stat. Ann. §§ 57-12-1, *et seq*.;

s.    N.Y. Gen. Bus. Law §§ 340, *et seq*.;

t.    N.C. Gen. Stat. §§ 75-1.1, *et seq*.;

u.    N.D. Century Code § 51-15-01, *et seq*.;

v.    Or. Rev. Stat. §§646.605, *et seq*.;

w.    R.I. Gen. Laws § 6-13.1-1, *et seq*.;

x.    S.C. Code Ann. § 39-5-10 *et seq*.;

y.   S.D. Codified Laws § 37-24-1, *et seq.*;

z.   Tenn. Code Ann. §§ 47-18-101, *et seq.*;

aa.  W.Va. Code § 46A-6-101, *et seq.*; and

bb.  Wis. Stat. § 100.20.

227.  On behalf of themselves and the State Law Class, Plaintiff seeks all appropriate relief provided for under the above statutes.

## **PRAYER FOR RELIEF**

228.  Newton and the Class Members seek the following relief:

a.   Certification of the Classes;

b.   Enter a judgment awarding Newton and the Class Members treble damages for the injuries they suffered as a result of Defendants' unlawful conduct;

c.   Award to Newton and Class Members their costs of suit, including reasonable attorneys' fees and expenses, pursuant to 15 U.S.C. § 15(a);

d.   Order that Defendants, their directors, officers, parents, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing any additional violations of the law as alleged herein; and

42

e. Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Newton respectfully demands a trial by jury on all issues that can be tried to a jury.

Date: August 2, 2024                              Respectfully submitted,

                                                  /s/ *Jeffrey C. Zwerling*
                                                  Jeffrey C. Zwerling
                                                  Justin M. Tarshis
                                                  Jessica Hermes
                                                  **ZWERLING, SCHACHTER &**
                                                  **ZWERLING, LLP**
                                                  41 Madison Avenue
                                                  New York, NY 10010
                                                  Telephone: (212) 223-3900
                                                  Email: jzwerling@zsz.com
                                                           jtarshis@zsz.com
                                                           jhermes@zsz.com